PETERSON, SHIRLEY & GUNTHER, APPELLANT, V. STATE OF
NEBRASKA, APPELLEE.

FILED SEPTEMBER 23, 1930.  No. 27343.

*C. F. Reavis,* for appellant.

*C. A. Sorensen, Attorney General, L. R. Newkirk* and
*Homer L. Kyle, contra.*

Heard before GOSS, C. J., ROSE, DEAN, GOOD, THOMPSON,
EBERLY and DAY, JJ.

PER CURIAM.

Plaintiff, a copartnership, appealed from a decree against
it for costs and dismissing its causes of action.

Plaintiff's causes of action grew out of its contracts with
the state for the construction of roads for various federal
aid projects in Nebraska prior to 1925.  There was con-
siderable money due plaintiff for which settlement had not

been made chiefly because of lack of money in the road fund to pay the state's share and partly because the state also asserted a counterclaim against plaintiff which plaintiff was unwilling to concede.

All claims involved in this suit were presented to the legislature of 1925 in an effort to get an appropriation to pay them. The legislature included in its deficiency appropriation bill, for this and other purposes and persons, the sum of $144,484.34 in favor of plaintiff. The act (Laws 1925, ch. 27), passed with an emergency clause, was approved March 31, 1925. It provides "that the several amounts herein appropriated shall be in full of claims owing by the state of Nebraska to said beneficiaries in whose favor said appropriations are made; that the said auditor of public accounts shall not deliver any warrant for any item herein appropriated until a receipt in full is filed by the beneficiary thereof."

The evidence shows that the legislature arrived at the amount of the appropriation by the following steps: There was considered as due plaintiff for the road work on the projects here involved a total of $301,385.14, of which $97,-650.59 would shortly be furnished by the federal government to the state and paid over (as it was) to plaintiff, and that the state, on its own account, was chargeable with the balance of $203,734.55; on the 28 items making up this balance, the legislative committee allowed interest on each at 7 per cent. from the date it was considered due until January 1, 1925, making the total of $18,385.13 interest, the said balance and interest thereon aggregating $222,-119.68; the state, however, claimed $66,477.15 from plaintiff for equipment sold or rented by it to plaintiff or to parties for whose payment the state claimed plaintiff was liable; on this item 7 per cent. interest was also computed, producing $11,158.19, and making the total of principal and interest claimed by the state on its counterclaim $77,635.34. The legislature deducted this counterclaim from the $222,119.68 and appropriated the balance of $144,-484.34.

On March 25, 1925, which was six days before the above named appropriation act was approved, the senate had passed a resolution reciting that differences exist between the plaintiff and the state relative to the amount due plaintiff for work done and materials furnished in the construction and repair of certain public highways within the state, and authorizing plaintiff to sue the state for all such demands arising out of such contracts.

About the middle of April, 1925, the plaintiff accepted from the state auditor a warrant for the amount appropriated by the legislature and gave to the auditor its receipt in full. The receipt specified that it was accepted as "payment in full of the claims mentioned in the within voucher" totaling $203,734.55 principal and $18,385.13 interest, or a grand total of $222,119.68. The claims mentioned in the voucher covered 28 different road projects. They were the items taken into consideration by the legislature in making the appropriation.

Soon after cashing its warrant the plaintiff brought suit against the state, relying on the authority of the senate resolution of March 25, 1925. In its amended petition it had 15 causes of action. When the case was tried it abandoned all but eight of these causes. Seven of the eight causes were based on work done on projects on which claims were presented to the legislature and on projects listed in the voucher receipted in full by the plaintiff when it received the warrant for the money appropriated by the legislature.

Only the thirteenth cause of action was based on a claim arising out of a project not shown among its 28 projects listed in the voucher receipted by the plaintiff as the consideration for the warrant for the deficiency appropriated by the legislature for the benefit of plaintiff. We think the evidence shows that this item was considered by the legislative committee but that it failed to appear on the voucher because it was for a claim on *quantum meruit* for extra gravel claimed to have been ordered put on road project 39 in Dawson county and settlement had been made on this project as originally contracted for. The officials repre-

senting the state claimed that the gravel was required by the contract. The legislature did not allow the claim. The auditor did not list it in the voucher receipted by plaintiff.

As to the causes of action which were comprehended within the legislative appropriation we think the law is well settled and well understood. The general principle is laid down in 1 R. C. L. 198, sec. 34, in these words: "If the claimant accepts the amount appropriated by the legislature in payment of his claim, his claim for the balance will be barred." This is the substance of the rule announced in *Calkins v. State,* 13 Wis. 434, and in *Massing v. State,* 14 Wis. 544; it being understood that there is no evidence of fraud, accident or mistake in matter of fact. The supreme court of the United States has laid down the rule that, even where the finding of the amount due is later accepted with knowledge that it is less than the amount claimed to be justly due, it will operate as a bar to further recovery. *United States v. Adams,* 7 Wall. (U. S.) 463; *United States v. Child & Co.,* 12 Wall. (U. S.) 232; *United States v. Clyde,* 13 Wall. (U. S.) 35; *Hemingway v. Stansell,* 106 U. S. 399. In the last cited case, the opinion written by Mr. Justice Gray, it was held that "the settlement and receipt bound the contractors as an accord and satisfaction, and they could not maintain a suit upon the original contract to recover further compensation for the work."

As to the causes of action now under discussion, the evidence shows that the receipt executed by the plaintiff, before the delivery by the auditor of the warrant for the full amount appropriated by the legislature, clearly identified all the projects which are the bases of the claims upon which these causes of action were founded. Before executing that receipt and accepting the voucher, it was the duty of the plaintiff to consider and to decide whether it would take the sum appropriated or whether it would rely on the authority of the senate resolution and sue the state for all claims it had against the state and disregard the appropriation. It elected to execute a receipt for the warrant and to specify as a consideration therefor the settlement of each and every project item listed in the receipt. There was

no fraud, accident or mistake of fact on plaintiff's part. It may be that the amount appropriated was far less than it could have proved to be due it and that the counterclaim of the state taken into consideration by the legislature was unjustly allowed in fixing the amount of the appropriation. With those things we have nothing to do, as they belonged to the legislative branch. The plaintiff has by its election made it impossible under the law for us to go behind the receipt. We are of the opinion that plaintiff cannot maintain its suit to recover further compensation for the work done upon the projects involved in these seven causes of action; and that the senate resolution has become inoperative, by act of the plaintiff, as a basis of authority to sue the state upon these causes.

The thirteenth cause of action is the only one remaining. It stands on a somewhat different footing than the others, chiefly by reason of the fact that it involves a project that was not identified by the receipt signed by the plaintiff. It was not listed among the "vouchers" on the front of the general voucher on the back of which plaintiff in its co-partnership name acknowledged receipt of the state warrant for $144,484.34 "which we accept as payment in full of the claims mentioned in the within voucher." It would seem that good practice would have caused the highway department to collaborate with the auditor's office so as to have included in the voucher, in compliance with the appropriation act, such information as would be "in full" of all claims in dispute. Yet we can readily understand that these were claims under contracts let years before and doubtless active contractors like these had many projects under construction that were not at all in dispute. This one having been omitted, we shall treat it as if intentionally omitted and as if still contemplated by the senate resolution to be such a dispute as to be the basis of a suit.

The facts in brief are these: Plaintiff had the contract for graveling Project No. 39, Dawson county. It called for an estimated 125,730 square yards of gravel surfacing at 37½ cents per square yard. The plans called for gravel four inches deep. The road project was about ten miles

long. When the approximately estimated quantity of gravel was spread it was found that there were nearly two miles of the project yet to be graveled. Plaintiff has been paid for the contract quantity, but is suing for extra gravel spread upon the last two miles. Plaintiff claims it was ordered to spread the gravel thicker than the contracted four inches and so used the contracted volume on less mileage. The state claims the gravel was not up to the screen tests required by the contract and so it was necessary to require it to be spread thicker. Be that as it may, the work halted for a considerable period with the two miles ungraveled. On September 12, 1924, the state engineer wrote the contractors giving them ten days to proceed to gravel the balance of the road. Shortly thereafter one of plaintiff's partners saw the state engineer and told him if they finished the graveling they would expect to be paid the contract price per yard, but a few days later he received a wire from Mr. Cochran, the state engineer, saying that if plaintiff did not "proceed immediately he would proceed himself and charge it up to us." So plaintiff finished the graveling and sued for the reasonable value thereof, which, at 37½ cents per square yard, for 23,601.55 square yards, amounts to $8,850.58.

It is to be borne in mind that on this particular project the contract contemplated that the whole mileage of the project would be surfaced by the plaintiff with the estimated and stated amount of gravel, and that, when the controversy arose, the state had paid in full under what it claimed was a mistake. Having discovered that the last stretch had not yet been graveled, the state engineer ordered plaintiff to gravel it or it would be graveled by the state at plaintiff's expense. The plaintiff did the work and now sues, not on the contract, but on a *quantum meruit*, for the reasonable value of its work. It takes the same measure of value per yard as was in the contract but alleges it as the reasonable value. It is elementary that the burden is on the plaintiff to prove its allegations. It must show that there was an express or implied agreement to pay for this so-called extra gravel. We find it has not sus-

tained this burden by a preponderance of the evidence and that the district court did not err in so concluding.

For the reasons stated in this opinion, the judgment of the district court is

AFFIRMED.